IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-270-D

| | |
|---|---|
| DEVONWOOD-LOCH LOMOND LAKE ASSOCIATION INC., a North Carolina non-profit corporation, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF FAYETTEVILLE,<br><br>        Defendant. | **ORDER** |

On June 8, 2018, Devonwood-Loch Lomond Lake Association, Inc., Arran Lake Homeowners Association, Inc., Rayconda Homeowners Association, Inc., Strickland Bridge Road Homeowners Association, Inc., John C. Lee, Catherine A. Lee, Martin Young, Ann Young, Gerald L. Ellison, J. F. Dunn Ellison, Dana E. Pike, and Nancy P. Pike (collectively, "plaintiffs") filed a complaint against the City of Fayetteville ("Fayetteville" or "the City") and City of Fayetteville Public Works Commission ("PWC") (collectively, "defendants"), alleging violations of federal law and state law arising from damage to private property. See [D.E. 1]. In plaintiffs' federal claim, plaintiffs allege that the City's stormwater mismanagement, when coupled with flooding from Hurricane Matthew, resulted in a taking of their property. Plaintiffs seek damages under 42 U.S.C. § 1983 and the Fifth Amendment Takings Clause. On June 29, 2018, plaintiffs filed an amended complaint [D.E. 20]. On August 15, 2019, the court dismissed PWC from the action [D.E. 49].

On September 15, 2020, the City moved for summary judgment [D.E. 73] and filed a memorandum in support [D.E. 74], statement of material facts [D.E. 75], and an appendix [D.E. 76].

On October 5, 2020, plaintiffs responded in opposition [D.E. 77] and filed a statement of material facts [D.E. 78] and an appendix [D.E. 79]. On October 26, 2020, Fayetteville replied [D.E. 82]. As explained below, the court grants the City's motion for summary judgment on the federal takings claim and dismisses plaintiffs' state law claims without prejudice.

I.

The case concerns four lakes and dams that the four plaintiff homeowners' associations ("HOAs") own. See [D.E. 75] ¶¶ 1–4; Rayconda Dep. [D.E. 79-18] 29; Arran Lake Dep. [D.E. 79-19] 69–70. The lakes were created by placing dams on tributaries to the Cape Fear River and impounding the waters. See [D.E. 75] ¶ 1; [D.E. 78] ¶ 1. Private landowners constructed all four dams before 1961. See [D.E. 75] ¶ 2; [D.E. 78] ¶ 2. The private landowners built the dams for recreational purposes, and the North Carolina Department of Environmental Quality ("NCDEQ") lists the dams as "amenity" dams. See [D.E. 75] ¶ 3; [D.E. 78] ¶ 3.

The City annexed Devonwood-Loch Lomond in 1996 and annexed the other three HOA properties in 2005. See [D.E. 75] ¶¶ 2, 14; [D.E. 78] ¶¶ 2, 14. The City maintains infrastructure to manage stormwater. See [D.E. 79-1, 79-2, 79-3, 79-4, 79-5, 79-6, 79-7]. Stormwater drains into and passes through the four dams and lakes. See Jewell Rep. [D.E. 79-8] 12, 19, 31; Jewell Dep. [D.E. 79-9] 147–49, 163; Bromby Dep. [D.E. 79-10] 19; Devonwood Dep. [D.E. 79-11] 48–50, 106–08, 117–18. Several regulations, including the Stormwater Ordinance, regulate the City's stormwater infrastructure. See [D.E. 79-15, 79-16]. The City also holds a federal National Pollutant Discharge Elimination System ("NPDES") permit, which authorizes the City to discharge stormwater from its separate storm sewer system ("MS4") into State waters. See Thomas-Ambat Decl. [D.E. 76-3] 5 & ¶ 2; [D.E. 79-17].

2

In October 2016, Hurricane Matthew hit Fayetteville, North Carolina. See Rutledge Decl. [D.E. 76-1] ¶¶ 6–7. Hurricane Matthew generated up to 11.22 inches of rain over a twenty-four-hour period, and 7.39 inches of rain over a six-hour period, in the relevant watersheds. See id. ¶ 6. Hurricane Matthew was significantly more intense than the "100-year storm," which is 8.41 inches in twenty-four hours and 6.04 inches in six hours. See id. ¶ 7.[1]

During Hurricane Matthew, all four of the relevant dams overtopped, meaning that flood waters rose above the crest of each dam. See id. ¶ 10. Three dams (Devonwood-Loch Lomond, Upper Rayconda, and Arran Lake) breached and lost the ability to impound water. See id. ¶ 11; Jewell Rep. [D.E. 79-8] 10, 15–16, 21; Jewell Dep. [D.E. 79-9] 33. Thus, the lakes returned to their natural state, with the tributaries meandering through the lakebeds. See Rutledge Decl. [D.E. 76-1] ¶ 11. The fourth dam, Strickland Bridge Road, did not breach but suffered severe damage. See id. ¶ 12; Jewell Rep. [D.E. 79-8] 27; Jewell Dep. [D.E. 79-9] 33.

The State classifies the four dams as small, "high hazard dams," meaning that they must be able to withstand a storm generating one-third of the "probable maximum precipitation" ("1/3 PMP") over a six- or twenty-four-hour period in the area. See Rutledge Decl. [D.E. 76-1] ¶¶ 8–9, 13; Jewell Dep. [D.E. 79-9] 87–88. Even though Hurricane Matthew exceeded the 100-year storm, it did not exceed 1/3 PMP. See Rutledge Decl. [D.E. 76-1] ¶ 9. The dams did not meet the 1/3 PMP standard when Hurricane Matthew struck. See id. ¶ 14.

Freese and Nichols, an engineering consulting firm specializing in water resources, conducted hydrologic modeling of the four relevant watershed sub-basins. See id. ¶¶ 1–5, 15–20. Hydrologists study the movement, distribution, and management of water. Methodologies include modeling and

---

[1] The "100-year storm" is a common regulatory flood boundary for municipal codes and federal flood risk mapping efforts. See Rutledge Decl. [D.E. 76-1] ¶ 7.

3

projecting the rise and peak of stormwater in a waterway under storm conditions and accounting for land use conditions in the watershed affecting the rate and volume of stormwater runoff. See id. ¶ 15. Hydrologists can use hydrologic modeling to model the rate and volume of stormwater based on historical land use conditions.

Freese and Nichols used hydrologic modeling to determine how high the water would have risen if Hurricane Matthew had occurred at an earlier date. See id. ¶¶ 16–18. In doing so, Freese and Nichols accounted for stormwater runoff in watersheds above the dams and the amount of impervious surfaces in the watersheds in the years for which it ran models. See id. ¶¶ 5, 20.

Freese and Nichols produced a hydrologic model showing what would have happened if Hurricane Matthew had occurred in 1961, shortly after the four dams were constructed and before significant urbanization in the watersheds above the dams. See id. ¶ 18. The model showed that all four dams would have overtopped in 1961 even if no urbanization had occurred in the watersheds between 1961 and 2016. See id. ¶¶ 21–23; cf. [D.E. 78] ¶¶ 19–20.

Freese and Nichols also ran hydrologic models showing what would have happened if Hurricane Matthew had occurred in 1996 (when the City annexed Devonwood-Loch Lomond) and 2005 (when the City annexed the other three communities). See Rutledge Decl. [D.E. 76-1] ¶ 18. The models showed that all four dams would have overtopped in 1996 or 2005 even if no urbanization had occurred between annexation and 2016. See id. ¶¶ 24–26; cf. [D.E. 78] ¶ 21. The models also showed that the four dams did not meet 1/3 PMP at the time of annexation. See Rutledge Decl. [D.E. 76-1] ¶ 27.

Freese and Nichols produced a hydrologic model for 2016, which predicted what actually occurred — all four dams overtopped. See id. ¶¶ 28–29. Together, the models showed that the increase in stormwater generated in the water basins above the dams between annexation and 2016

4

was negligible and that the majority of stormwater runoff due to urbanization occurred before the City annexed the four properties. See id. ¶¶ 30, 32–33; cf. [D.E. 78] ¶ 23.

Plaintiffs allege a Fifth Amendment takings claim under 42 U.S.C. § 1983. See Am. Compl. [D.E. 20] ¶¶ 57–62. Plaintiffs also allege North Carolina state law claims for breach of easements, inverse condemnation, negligence, negligence per se, nuisance, trespass, and unjust enrichment. See id. ¶¶ 63–101. Plaintiffs seek monetary and injunctive relief. See id. at 22–23.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere

5

existence of a scintilla of evidence in support of plaintiff's position [is] insufficient...." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

III.

Plaintiffs seek relief under 42 U.S.C. § 1983 and the Fifth Amendment Takings Clause. See Am. Compl. ¶¶ 57–62. "To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); see Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Additionally, a section 1983 plaintiff must allege the personal involvement of a defendant. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676–77 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

The Fifth Amendment Takings Clause applies to the States through the Fourteenth Amendment. See, e.g., Murr v. Wisconsin, 137 S. Ct. 1933, 1942 (2017); Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005). It provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). The Takings Clause applies to temporary government actions as well as permanent ones. See Cedar Point Nursery v. Hasad, 141 S. Ct. 2063, 2071–78 (2021); Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 322 (2002); First Eng. Evangelical Lutheran Church v. Cnty. of

6

Los Angeles, 482 U.S. 304, 318–19 (1987); Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, 135 F.3d 275, 285 (4th Cir. 1998). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle, 544 U.S. at 537. For example, when the government uses its eminent domain power to condemn a person's land for some public purpose (such as to build a road or a military base), the government has "taken" that land and must pay just compensation for it. See, e.g., Penneast Pipeline Co. v. New Jersey, 141 S. Ct. 2244, 2255–58 (2021); Cedar Point Nursery, 141 S. Ct. at 2071; Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 31–32 (2012); Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot., 560 U.S. 702, 713–15 (2010); Lingle, 544 U.S. at 537; Tahoe–Sierra, 535 U.S. at 321–22.

Government action constitutes a physical taking without just compensation if (1) "the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking" and (2) "that property interest was taken." Est. of Hage v. United States, 687 F.3d 1281, 1286 (Fed. Cir. 2012) (quotations omitted); see Klamath Irrigation Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); White v. City of Greensboro, 408 F. Supp. 3d 677, 703 (M.D.N.C. 2019); Patty v. United States, 136 Fed. Cl. 211, 214 (2018). The claimant must first identify a cognizable property interest before the court will consider whether a taking occurred. See Hage, 687 F.3d at 1286; Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212–13 (Fed. Cir. 2005). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998) (quotation omitted); see Cedar Point Nursery, 141 S. Ct. at 2075–76; Stop the Beach Renourishment,

7

Inc., 560 U.S. at 707; Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013).

A.

"A property loss compensable as a taking only results when the asserted invasion is the direct, natural, or probable result of authorized government action." St. Bernard Par. Gov't v. United States, 887 F.3d 1354, 1360 (Fed. Cir. 2018); see Sanguinetti v. United States, 264 U.S. 146, 149–50 (1924); Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003). "Takings liability must be premised on affirmative government acts." St. Bernard Par. Gov't, 887 F.3d at 1361–62 & n.4 (collecting cases); see Lucien v. Johnson, 61 F.3d 573, 576 (7th Cir. 1995) ("Accidental injuries are not takings"); Bench Creek Ranch, LLC v. United States, No. 2020-2151, 2021 WL 1828065, at *2 (Fed. Cir. May 7, 2021) (unpublished); Drake v. Vill. of Lima, No. 6:20-CV-06112 EAW, 2021 WL 1197714, at *4–5 (W.D.N.Y. Mar. 30, 2021); Funderburk v. S.C. Elec. & Gas Co., No. 3:15-cv-04660-JMC, 2019 WL 3504232, at *5 (D.S.C. Aug. 1, 2019) (unpublished); Sunflower Spa LLC v. City of Appleton, No. 14-C-861, 2015 WL 4276762, at *1–2 (E.D. Wis. July 14, 2015) (unpublished).

A plaintiff asserting a takings claim must prove that "government action caused the injury." St. Bernard Par. Gov't, 887 F.3d at 1362; see Mississippi v. United States, 146 Fed. Cl. 693, 701 (2020). To meet this burden, "a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury." St. Bernard Par. Gov't, 887 F.3d at 1362; see Mississippi, 146 Fed. Cl. at 701. Thus, a plaintiff must show "what would have occurred" absent the government's action. United States v. Archer, 241 U.S. 119, 132 (1916); see St. Bernard Par. Gov't, 887 F.3d at 1362; Mississippi, 146 Fed. Cl. at 701; Orr v. United States, 145 Fed. Cl. 140, 154 (2019).

8

For a flood-based taking, a plaintiff needs to "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all." St. Bernard Par. Gov't, 887 F.3d at 1363–68 (plaintiffs failed to show causation where they merely alleged that the government's construction and operation of a channel led to flood damage during Hurricane Katrina, but failed to provide a baseline against which to compare the government's actions). When evidence indicates that flooding would have damaged the property even absent government action, a plaintiff fails to state a takings claim. See, e.g., Sanguinetti, 264 U.S. at 149–50 (plaintiff failed to state a takings claim where property flooded before the government built the canal); cf. Archer, 241 U.S. at 132. Put simply, a plaintiff must show that governmental action proximately caused the property damage. See St. Bernard Par. Gov't, 887 F.3d 1363–68.

1.

First, the City contends that plaintiffs fail to present evidence to support their claim that the City's stormwater mismanagement proximately damaged their property. See [D.E. 74] 6–9. In support, the City notes that plaintiffs have presented no expert testimony concerning proximate causation. See id.

Expert testimony is admissible where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "[E]xpert testimony is mandatory when attempting to reach a conclusion that necessitates specialized knowledge." Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd., 859 F. Supp. 2d 771, 777 (E.D. Va. 2012) (collecting cases), aff'd, 505 F. App'x 242 (4th Cir. 2013) (per curiam) (unpublished); see Pridgen v. IRS, 2 F. App'x 264, 274 n.5 (4th Cir. 2001) (per curiam) (unpublished); Stewart Title Guar. Co. v. Linowes & Blocher, 42 F.3d 1386, 1994 WL

9

689122, at *5 (4th Cir. Dec. 12, 1994) (per curiam) (unpublished table decision). Where a plaintiff must offer expert testimony on an issue but a plaintiff offers none, a court should grant summary judgment for the defendant. See Thompson v. Brisk Transp., 401 F. App'x 826, 828 (4th Cir. 2010) (unpublished); Trident Prods., 859 F. Supp. 2d at 776–77; see also C.W. ex rel. Wood v. Textron, Inc., 807 F.3d 827, 838–39 (7th Cir. 2015); Pride v. BIC Corp., 218 F.3d 566, 580–81 (6th Cir. 2000).

"Causation of flooding is a complex issue which must be addressed by experts." Hendricks v. United States, 14 Cl. Ct. 143, 149 (1987). Lay testimony regarding flooding is "entitled to little weight in determining causation." Alost v. United States, 73 Fed. Cl. 480, 505 (2006); see Leeth v. United States, 22 Cl. Ct. 467, 486–87 (1991) ("While a lay person merely through observation can identify that a backwater effect is occurring at a particular point, the source of that effect cannot be identified by that lay person because it would 'look the same' regardless of its cause."); Hendricks, 14 Cl. Ct. at 149; Herriman v. United States, 8 Cl. Ct. 411, 420 (1985). Here, in order to prove proximate causation, plaintiffs must provide expert testimony showing that the City's mismanagement of the stormwater system proximately caused the damages to their property. See St. Bernard Par. Gov't, 887 F.3d at 1363–68 (plaintiffs should "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had not been government action at all.").

Plaintiffs argue that their expert, Douglas Jewell ("Jewell"), analyzed causation in his report and testimony. Compare [D.E. 74] 8 and [D.E. 82] 4–5 with [D.E. 77] 7–8. Plaintiffs retained Jewell to assess the condition of the four dams after Hurricane Matthew and to provide a cost estimate for repairs. See Jewell Dep. [D.E. 79-9] 46–48. Jewell, however, did not investigate what would have happened to the dams absent the City's alleged stormwater mismanagement. See id. at

10

94. Rather, Jewell's report merely noted that the lakes and dams formed "a component of the City's stormwater management infrastructure." Jewell Rep. [D.E. 79-8] 12, 19, 31. Moreover, Jewell opined that the "failure of these dams is also the culmination of years of stormwater being routed through these facilities[,]" that "the degradation of these facilities ha[d] been ongoing for many years," and that Hurricane Matthew was "the straw that broke the camel's back." Jewell Dep. [D.E. 79-9] 163. Furthermore, Jewell did not examine whether the dams could have ever withstood Hurricane Matthew even absent the alleged stormwater mismanagement. Jewell also did not compare the actual flood damage with hypothetical flood damage absent the alleged government action. Cf. id. at 91–94. Thus, Jewell's expert testimony fails to create a genuine issue of material fact about causation.[2]

Alternatively, plaintiffs contend that the testimonies of two of the City's witnesses, John Larch ("Larch") and Craig Bromby ("Bromby"), create a genuine issue of material fact concerning causation. See [D.E. 77] 8–12. As for Larch, plaintiffs contend that Larch testified about four hydrology analysis maps that the City created. See id. at 9–10; [D.E. 79-1, 79-2, 79-3, 79-4, 79-5, 79-6, 79-7].[3] According to plaintiffs, the maps illustrate the City's stormwater infrastructure, showing where the system receives, transfers, and discharges stormwater. See [D.E. 77] 9–10. According to plaintiffs, Larch also testified that when the City annexed plaintiffs' four dams in 1996 and 2005, it adopted plaintiffs' dams as part of its stormwater infrastructure and had to inspect and maintain the dams, but the City never inspected or maintained the plaintiffs' lakes or dams. See id.

---

[2] Plaintiffs also contend that the City's actions are so egregious that they negate the requirement of expert testimony. See [D.E. 77] 6. The court rejects this argument.

[3] Plaintiffs did not submit Larch's deposition transcript. This failure warrants disregarding the testimony. In any event, the court has reviewed plaintiffs' description of the alleged testimony, and the court rejects plaintiffs' argument.

11

at 11. As for Bromby, Bromby testified that "there are outfalls from the municipal system that discharges to [plaintiffs'] ponds or to streams upstream of [plaintiffs'] ponds." Bromby Dep. [D.E. 79-10] 19.

Larch's testimony and Bromby's testimony do not create genuine issue of material fact about causation. Their testimony merely indicates that the City discharged some stormwater into plaintiffs' lakes and the streams connected to the lakes and that the City did not inspect or maintain the dams. Their testimony, however, does not indicate that the City's alleged stormwater mismanagement or failure to inspect and maintain the dams caused the dams to overtop. Thus, the testimony does not create a genuine issue of material fact about causation.

Next, plaintiffs argue that the City failed to comply with governing stormwater ordinances and regulations and thereby caused the dams to overtop. See [D.E. 77] 12–15. In support, plaintiffs argue that the City's NPDES permit required the City to maintain and improve its MS4 system and that violating the NPDES permit may have led to a stormwater pipe failure. See id. at 14–15; cf. Bromby Dep. [D.E. 79-10] 28–29. Plaintiffs also contend that the City's annexation of the dams created a duty to ensure that plaintiffs' dams were maintained, including complying with the State criteria of 1/3 PMP. See [D.E. 77] 16–17. Because Freese and Nichols's models show that the dams would not have overtopped if the dams conformed with the 1/3 PMP requirement, plaintiffs assert that the City's failures to comply with its alleged legal duties caused the dams to overtop. See id.

The City responds that plaintiffs cannot identify a City project or any other action altering the flow of stormwater. See [D.E. 82] 7. The City also contends that it did not have a duty to maintain plaintiffs' property, that the City did not violate the Stormwater Ordinance or NPDES permit, and that plaintiffs misunderstand the definition of MS4. See id. at 6–9.

Plaintiffs' argument that the City mismanaged its stormwater system regarding the

12

Stormwater Ordinance and NPDES permit does not create a genuine issue of material fact concerning causation. As for the Stormwater Ordinance, plaintiffs contend that because the dams breached, the City must have allowed improper runoff in violation of the Stormwater Ordinance. As for the assertion that the City's violation of the NPDES permit caused a pipe to fail, plaintiffs offer a noncommittal, hypothetical statement from Bromby. Plaintiffs, however, ignore the second part of Bromby's statement, where Bromby testified that "[w]hether that [violation of the NPDES permit] is as a matter of tort law, whether the city is liable, it depends on the facts of that case." Bromby Dep. [D.E. 79-10] 29. Moreover, and in any event, plaintiffs offer no evidence that but for the City's alleged violations of the Stormwater Ordinance or NPDES permit, the dams would not have overtopped. Simply put, even viewing the record in the light most favorable to plaintiffs, plaintiffs cannot show that these alleged violations proximately caused their property damage.

In St. Bernard Parish Government, plaintiffs alleged that the government's operation of a municipal system led to flood damage during a hurricane, but plaintiffs failed to provide a baseline against which to compare the government's actions. See St. Bernard Par. Gov't, 887 F.3d at 1363–68. As in St. Bernard Parish Government, plaintiffs in this case fail to compare "the flood damage that actually occurred to the flood damage that would have occurred if there had not been government action at all." Id.

As discussed, "takings liability must be premised on affirmative government acts." Id. at 1361–62 & n.4 (collecting cases); see Lucien, 61 F.3d at 576; Bench Creek Ranch, 2021 WL 1828065, at *2; Drake, 2021 WL 1197714, at *4–5; Funderburk, 2019 WL 3504232, at *5; Sunflower Spa, 2015 WL 4276762, at *1–2. In the flooding context, "the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, [but] it does not state a takings claim." St. Bernard Par. Gov't, 887 F.3d at 1360; see Cedar Point Nursery, 141

13

S. Ct. at 2078–79; United States v. Sponenbarger, 308 U.S. 256, 265 (1939). Thus, for example, a government's negligence or failure to maintain sewage or drainage systems resulting in flooding does not create a federal takings claim. See, e.g., Drake, 2021 WL 1197714, at *4–5 (plaintiffs failed to state a claim where they alleged that a municipality's negligence in maintaining and operating a sewer line caused back flow); Funderburk, 2019 WL 3504232, at *5 (municipality's failure to "maintain, operate or repair" drainage system did not support a takings claim); Sunflower Spa, 2015 WL 4276762, at *1–2 (a municipality's negligence in maintaining its water mains is not a basis for a takings claim).

Alternatively, even if the City had a duty to inspect or maintain the dams or to meet the State criteria of 1/3 PMP, the City's alleged failures do not suffice to create a federal takings claim. See St. Bernard Par. Gov't, 887 F.3d at 1360–62; Drake, 2021 WL 1197714, at *4–5; Funderburk, 2019 WL 3504232, at *5; Sunflower Spa, 2015 WL 4276762, at *1–2; see also Cedar Point Nursery, 141 S. Ct. at 2073–79. Thus, even viewing the record in the light most favorable to plaintiffs, no genuine issue of material fact exists.[4]

2.

Next, the City argues that it presented undisputed expert evidence that plaintiffs' dams would have overtopped during a storm event like Hurricane Matthew even if no urbanization occurred in plaintiffs' watersheds between 1961 and 2016. In support, the City cites its hydrology model of a similar, hypothetical event in 1961 which shows that the dams would have overtopped even if no urbanization had occurred. See [D.E. 74] 11. The City also cites its 1996 and 2005 hydrology models, which show that the dams would have overtopped at annexation. See id. Thus, the City

---

[4] The court declines to address whether plaintiffs' lakes and dams are part of the City's MS4 system. Regardless, no genuine issue of material fact exists as to causation. Cf. [D.E. 82] 8 n.2.

argues that it has presented undisputed expert evidence that the dams would have overtopped during a storm event like Hurricane Matthew absent any urbanization between 1961 and 2016. See id. at 13.

Plaintiffs respond that the opinions of other experts and witnesses raise a genuine issue of material fact concerning causation. See [D.E. 77] 15. In support, plaintiffs contest aspects of Freese and Nichols's models, including a degree of error or deviation. Plaintiffs also contend that urbanization may account for minor discrepancies in the 1961 model, note a failure to show how many pipes flow through private yards or how much developed runoff passes through properties, cite a failure to calculate the damage done to properties, and mention a failure to account for the legal effect of the City's annexation. See id. at 15–16.

Plaintiffs' arguments do not create a genuine issue of material fact concerning causation. Notably, plaintiffs failed to offer an expert rebuttal opinion contesting Freese and Nichols's analyses. Cf. [D.E. 53] 2. Plaintiffs also failed to present any expert testimony concerning causation, even though Jewell testified such an exercise was possible. See Jewell Dep. [D.E. 76-2] 15; [D.E. 79-9] 94. Even viewing the record in the light most favorable to plaintiffs, the dams would have overtopped even absent the alleged government action. Cf. Thompson, 401 F. App'x at 828; Trident Prods., 859 F. Supp. 2d at 776–77.

3.

In support of their causation argument, plaintiffs cite increased silt and debris after Hurricane Matthew. See [D.E. 20] ¶ 20. The City responds that plaintiffs did not present evidence of a causal relationship between alleged increases in silt and debris accumulation in plaintiffs' lakes and their dams overtopping during Hurricane Matthew. See [D.E. 74] 13. In support of the City's response, the City cites John L. Rutledge's ("Rutledge") declaration. See id. Rutledge states:

15

> The alleged impact due to siltation is incorrect .... This is because all the silt and debris that gets deposited within the pool of each lake reduces the normal storage of the lake that would otherwise be filled with water. Regardless of whether that volume is filled with silt or water, it is not available for flood storage. Flood storage volume is the volume above the normal pool that can be used during flood events like Hurricane Matthew and is unaffected by these deposits. Therefore, the siltation that has been occurring since the dams were built was not a contributory factor to the fact that these dams overtopped during Hurricane Matthew.

Rutledge Decl. [D.E. 76-1] ¶ 34.

Even viewing the record in the light most favorable to plaintiffs, plaintiffs fail to present evidence concerning the source or causation of siltation or debris accumulation, its relationship to flooding, or an affirmative act by the City. Cf. Jewell Dep. [D.E. 79-9] 77–78; Devonwood Dep. [D.E. 79-11] 118. Plaintiffs also fail to offer an expert rebuttal contesting Rutledge's testimony. Cf. [D.E. 53] 2. Thus, even viewing the record in the light most favorable to plaintiffs, plaintiffs fail to create a genuine issue of material fact concerning whether the dams would not have overtopped but for the City's actions. In contrast, the City has presented uncontradicted expert testimony showing that the dams would have overtopped even absent government action. Cf. Thompson, 401 F. App'x at 828; Trident Prods., 859 F. Supp. 3d at 776–77. Accordingly, no genuine issue of material fact exists.

B.

The City argues that plaintiffs cannot state a takings claim based on their riparian interests. See [D.E. 74] 17–18. In support, the City cites Jewell's testimony that the City's alleged use of the lakes in its stormwater system did not deprive plaintiffs of the right to use the lakes. See id.

"North Carolina [] adheres to the American Rule of water use where the landowner has the right [] to a reasonable and beneficial use of the waters upon its land or its percolations or to some useful purpose connected with his occupation and enjoyment." BSK Enters., Inc. v. Beroth Oil Co.,

246 N.C. App. 1, 20, 783 S.E.2d 236, 250 (2016) (quotations omitted); see Bayer v. Nello L. Teer Co., 256 N.C. 509, 516, 124 S.E.2d 552, 556 (1962). Jewell testified that the City did not deprive plaintiffs of using the lakes for "recreational or other purposes[.]" Jewell Dep. [D.E. 76-2] 16–17; see Jewell Dep. [D.E. 79-9] 153–54; cf. Rayconda Dep. [D.E. 79-18] 29; Arran Lake Dep. [D.E. 79-19] 69–70. Even viewing the record in the light most favorable to plaintiffs, no genuine issue of material fact exists concerning any takings claim regarding plaintiffs' riparian interests.

C.

Plaintiffs contend that the City took their property by dumping stormwater runoff onto plaintiffs' dry lands after Hurricane Matthew, causing erosion and property degradation. See [D.E. 77] 18–20. In support, plaintiffs contend that the City violated its NPDES permit by not discharging stormwater from its MS4 system into "waters of the State." Id. at 18. According to plaintiffs, such a violation creates a nuisance condition, resulting in a taking of plaintiffs' property. See id. at 18–20.

The City responds that plaintiffs offer no evidence that the City diverted stormwater onto dry lake beds. See [D.E. 82] 9–10. The City also argues that plaintiffs provide no legal authority for asserting that the City violated its NPDES permit merely because plaintiffs' dams failed and the lakes were lowered or lost. See id. at 10.

A taking requires a property interest and a government taking of said property interest. See Hage, 687 F.3d at 1286; Klamath Irrigation Dist., 635 F.3d at 511; White, 408 F. Supp. 3d at 703; Patty, 136 Fed. Cl. at 214. Plaintiffs have a property interest in their dry lake beds. As for whether the City took the property interest, plaintiffs' expert Jewell noted that a stream channel formed through Arran Lake after the dam breached. See Jewell Rep. [D.E. 79-8] 10. Jewell's expert report, however, merely noted that a stream channel formed in Arran Lake after Hurricane Matthew, but does not indicate its source. See id. Thus, the argument fails.

17

Alternatively, even assuming that the City channeled stormwater onto plaintiffs' dry lands, plaintiffs fail to "present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had not been government action at all." St. Bernard Par. Gov't, 887 F.3d at 1363–68. Thus, plaintiffs do not show that absent action by the City, stormwater would not have been diverted onto dry lake beds after Hurricane Matthew. See id. Accordingly, plaintiffs fail to show causation and fail to show a post-Matthew taking of their property.

IV.

Plaintiffs' Fifth Amendment takings claim is the sole federal claim over which this court has original jurisdiction. A district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); see Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27 (1966); ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 394 (4th Cir. 2012); Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995). In making its decision, a court may consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Shanaghan, 58 F.3d at 110; see Carnegie Mellon Univ., 484 U.S. at 350 n.7; Gibbs, 383 U.S. at 726–27; Crosby v. City of Gastonia, 635 F.3d 634, 644 n.11 (4th Cir. 2011). A court also may consider the time investment of the court and parties and "the existence of some significant issue of state law best resolved in state court." Shanaghan, 58 F.3d at 112; see McCullough v. Branch Banking & Tr. Co., 844 F. Supp. 258, 260–62 (E.D.N.C. 1993), aff'd, 35 F.3d 127 (4th Cir. 1994); see also Gunsay v. Mozayeni, 695 F. App'x 696, 703–04 (4th Cir. 2017) (per curiam) (unpublished).

The City argues that judicial economy weighs in favor of the court exercising supplemental jurisdiction over plaintiffs' state law claims. See [D.E. 74] 18–19. In support, the City notes that

18

the case has been pending for approximately three years, the parties engaged in substantial discovery, and the court has invested significant resources. See id. at 19. The City also argues that the absence of causation evidence is similarly fatal to plaintiffs' state law claims. See id.

Plaintiffs' remaining claims involve seven hotly contested and unsettled issues of state tort law. Moreover, although the parties have engaged in extensive discovery, they will be able to use that discovery in state court. Accordingly, after balancing the relevant factors, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. See, e.g., Shanaghan, 58 F.3d at 110–12; Rettew v. S.C. Dep't of Parks Recreation & Tourism, No. 9:10-cv-00282-RMG, 2012 WL 13135591, at *3–4, 6 (D.S.C. Apr. 9, 2012) (unpublished). Thus, the court dismisses without prejudice plaintiffs' state law claims.

V.

In sum, the court GRANTS defendant's motion for summary judgment on the federal takings claim [D.E. 73], DECLINES to exercise supplemental jurisdiction over plaintiffs' state law claims, and DISMISSES WITHOUT PREJUDICE plaintiffs' state law claims. The clerk shall close the case.

SO ORDERED. This _6_ day of August 2021.

JAMES C. DEVER III
United States District Judge